387 So.2d 891 (1980)
Homer Lee JOHNSTON
v.
STATE.
7 Div. 650.
Court of Criminal Appeals of Alabama.
April 1, 1980.
Rehearing Denied May 6, 1980.
Andrew W. Bolt, II of Wilson, Propst, Isom, Jackson, Bailey & Bolt, Anniston, for appellant.
*892 Charles A. Graddick, Atty. Gen., Joseph G. L. Marston, III, Asst. Atty. Gen., for appellee.
HARRIS, Presiding Judge.
Appellant was convicted of murder in the first degree, involving the death of his wife, and the jury fixed his punishment at life imprisonment in the penitentiary. Throughout the trial proceedings he was represented by counsel of his choice and at arraignment pleaded not guilty.
The evidence presented by the State is entirely circumstantial. When the State rested its case appellant moved to exclude the evidence on the ground the State had failed to make out a prima facie case. This motion was overruled.
At the time of her death, the deceased, Ida Jane Johnston, was employed at Classe Ribbon Company in Anniston, Alabama. She clocked out of work at 10:59 on Saturday night, March 12, 1977, and at approximately 12:00 midnight her automobile was discovered engulfed in flames on Winchester Road, at a point about two and three-tenths miles from her home. The Anniston Fire Department extinguished the fire but, because of the intense heat from the burning automobile coupled with the steam resulting from the firemen's efforts to bring the fire under control, it was impossible to inspect the interior of the automobile until the next morning. At that time a body was discovered in the front seat of the car which was later identified to be Ida Jane Johnston.
On the morning of March 13, 1977, Deputy State Fire Marshal W. B. Houston arrived at the scene of the burned automobile. He conducted an examination in an effort to determine the origin of the fire. He found the interior of the car burned out. He also found particles of an old quilt and part of a floor mat and took samples for laboratory examination. He was unable to determine the cause of the fire from his inspection from inside the car. He checked the motor portion of the automobile and stated, "First I started (with) the battery which had been burned out, but we were able to determine the positive and negative cables which were intact and didn't show an indication of a shortage. We traced the wiring from the motor back to the interior part of the car and I found no indication of electrical shorts . . . checked the carburetor which was still intact and the gas line which the rubber connections matched. They had been burned off, but showed they were still intact." He checked the oil in the motor and in the transmission but did not find anything unusual. A wrecker was used to move the car and Houston checked the ground for the odor of accelerants but this proved fruitless. He removed from the floorboard of the car some liquid which appeared to contain an oily substance. This was turned over to Mr. John Case of the State Toxicology Laboratory. He did not remove what was left from a partly burned Bible. A melted soda pop bottle had been removed by someone before Houston saw it. Present in the car and underneath it was an oily smelling odor which he was unable to identify. He testified that he did not get to see the interior finish because it was totally consumed by the fire and he did not know if it was naugahyde or a plastic substance of some type. He further said he did not check the wiring under the dash nor the cigarette lighter. Based upon his experience and examination of the car he expressed the opinion that the fire started in the interior section of the car rather than in the motor compartment.
Mr. Houston had considerable experience in investigating fires where arson was suspected. He had been Fire Marshal for the City of Gadsden for twenty years and had been with the State Fire Marshal's Office for eight years. His training included schools on arson at the University of Alabama, publications, and training with the American Insurance Association, formerly known as the National Board of Fire Underwriters.
Police Lieutenant Richard Townsley was an evidence technician with the Anniston Police Department on March 13, 1977. Acting in this capacity he went to the scene of the burned automobile and processed the *893 automobile and took photographs. He and Officer Gilmore searched the automobile and found the remains of a human body. He photographed the interior of the car and State's Exhibits 2, 3, 5, 6, 7 and 8 were identified as accurately depicting what they observed. These photographs were admitted into evidence. Other items observed on the front seat area were a melted soft drink bottle; two car keys, one of which was half burned and the other one fit the trunk of the car; a burned Thermos bottle; 15 pennies, 1 dime, 1 quarter; a pair of small scissors and 2 fingernail files; a family Bible almost totally burned; one partially burned sandal; one orange colored plastic ice scraper, and some unidentifiable cloth and material. These items were sent to the State Crime Laboratory. A number of teeth were recovered from the floorboard on the driver's side, some from the springs and one from the rear floorboard. A sample from the floor mat was taken for laboratory analysis. When the body was removed pieces of burned clothing were removed from the front seat which later were helpful in identifying the victim. The pieces of cloth were given to the Coroner who took custody of what remained of the body.
Lieutenant Townsley stated the car was parked on the side of Winchester Road just a few feet from a tree and that the branches on the tree were burned to a height of 20 feet. He checked the gasoline tank of the car and found it intact and containing a small amount of gas. The area around the car yielded a number of items, including cigarette butts which were about four feet from the car, a man's shoe, a knife, and a charcoal lighter can. A sample of the fluid from this can was also sent to the Crime Laboratory. The shoe was some distance from the car and was full of water. A photograph was made of this shoe, but it did not serve any useful purpose. He checked for footprints but was unable to find any that proved helpful as there were many footprints in the area made by the firemen and others involved in the investigation. Lieutenant Townsley stated that the car was burned at approximately 11:00 p. m., Saturday. He did not actually find any piece of cloth that was green or corduroy. He did not see any part of a tan coat which belonged to appellant and was allegedly worn by the victim the night she was burned to death.
March 13, 1977, was a clear sunny day, about 70 degrees, and it had not rained the day before. Some distance down the road the officers found a large shopping bag full of paperback pornographic books, none of which had pictures but they were never connected to the burned automobile. A logging road or trail led from the car to a place near where appellant and the deceased lived. Several officers and laboratory experts checked this trail by walking it on March 16, but did not find any items of evidence which proved helpful in the investigation. Walking slowly, and looking closely, they took about 2½ hours to check the trail. Townsley testified that a hurried walk of this trail would take not more than 15 to 20 minutes and that someone who was familiar with the trail could walk it at night without a light.
Dr. Carlos Rabren is a Toxicologist with the State of Alabama Department of Forensic Sciences and is currently the Director. He detailed his background, education and experience and testified that he had performed over two thousand autopsies. His qualifications as an expert were not questioned. He performed an autopsy on the body of the victim of the automobile fire on March 14, 1977, at the morgue at the Auburn facilities in the presence of Ralph Phillips, Coroner of Calhoun County, and Steven Taylor, a mortician with the Department of Forensic Sciences. The body was delivered to Auburn by the Coroner who returned the body to Calhoun County for burial after the autopsy.
In summary, Dr. Rabren testified the body was badly burned, weighing only fifty-two pounds. The bones above the ear level were burned away leaving a small portion of the top of the head; the left arm was burned off above the wrist; the right arm was burned away at the level of the shoulder; the right leg was burned off at a *894 point below the pubic area; the left leg was burned off at the level of the knee; the back view showed a small portion of the head and torso; a portion of the left arm and leg remained; the buttocks and most of the fat and muscle tissues were burned away; a view from the posterior revealed internal organs including the liver, kidneys and the abdominal cavity. The front portion of the torso was not as extensively burned; remnants of clothing, pubic hairs and breasts remaining; and the eyelids, nostrils, nose, and lower jaw were burned away. There was no lower plate or natural teeth present in the mouth, but there was an upper dental plate.
Examining the body internally Dr. Rabren found a large quantity of soot in the bronchial and lower trachea going into the lungs. He found no evidence of any trauma or violence, lacerations to the heart, lungs or abdominal cavity other than the trauma associated with the fire. He found no evidence of a gunshot or stab wound in the remaining tissue. X-rays of the body revealed no evidence of foreign projectiles or metallic objects such as bullets. The only fractured, cracked or broken bones were directly associated with the fire, and there was no evidence of sexual molestation. He stated the victim was breathing at the time or during the fire evidenced by the finding of soot in the lungs. He extracted a sample of blood to determine the amount of carbon monoxide. This examination was conducted by a Toxicologist under his supervision and enough carbon monoxide was found to saturate 36 percent of the red cells in the sample of blood. He further testified that "36 percent saturation of the hemoglobin (red cells) would place a human being in a serious situation with that level of carbon monoxide in the blood. A person so situated would become extremely drowsy and would start to be rendered unconscious by the effects of carbon monoxide alone. It definitely indicates that the person was probably breathing atmosphere which was contaminated with carbon monoxide. There was no evidence of alcohol in the blood sample."
Dr. Rabren stated that in the front portion of the pubic area was a part of a pair of denim pants with the zipper closed all the way up, but the snap was undone. The front part revealed a pair of white panties and a pair of panty hose in normal position for wearing. The remains of the body were delivered for the autopsy in a black disaster pouch or black bag. Present in the pouch was a piece of cloth that was similar to green corduroy, coat-like material. He also found two rings in the disaster pouch with the remains of the victim.
On cross-examination Dr. Rabren testified that finding soot in the lungs and carbon monoxide would be in conflict with death by strangulation, but the victim could have been choked or strangled to the point that she could have lost enough oxygen to pass out prior to the fire. However, this could not be determined because all the tissues were burned away by the fire. He said there was no evidence that the victim had taken an overdose of drugs as the laboratory analysis of tissue showed no drugs, poison, or alcohol, except carbon monoxide.
Mr. Jim Rosier is the manager of Lorch's Diamond Shop on Noble Street in Anniston. He has managed the shop, which principally retails jewelry, for five years. Ida Jane Johnston traded with Lorch's and Rosier identified the rings, identified as State's Exhibit 9, as rings purchased by her from the store.
Mr. Ralph Phillips is the Calhoun County Coroner, and has been for eight years. As Coroner he was called to the burned-out car on Winchester Road at about 10:05 a. m., March 14, 1977. He examined the scene and took some photographs before moving the body. He was assisted in the removal of the body by the rescue squad. The body was placed in a large plastic bag called a pouch. He identified State's Exhibits 1, 2, 6, 3 and 5 as depicting the car, the body lying in the front seat under the steering wheel, the springs and seats burned clean. He took the body first to the Gray Brown Funeral Home and then to Auburn. Although he examined the car, he did not remove any of its contents. Phillips turned *895 the body over to Rabren and was present during the autopsy. Subsequently he returned to the funeral home with the body.
Mr. John Case is a criminologist with the Department of Forensic Sciences. He has a bachelor's degree in Chemistry from Birmingham Southern College and has engaged in graduate studies in biochemistry and toxicology at the University of Alabama in Birmingham. His principal duties include examining physical evidence such as controlled substances for illegal drugs and body tissue and fluids for alcohol and poisons. His qualifications were not questioned.
During the early hours of March 14, 1977 he investigated the scene of the incident. When he arrived several members of the Anniston Police Department were already conducting their investigation. He stated that Mr. Houston arrived after he did. Case assisted Townsley and Gilmore in examining the residue inside the car. After the body was removed from the car, Case, Townsley and Gilmore used a shovel and screen and sifted through the residue looking for bullets or other evidence. They examined the soil around the car for any odor of inflammable accelerants. They searched for glass in the car and accounted for the origins of all that was found. Case identified State's Exhibits 1, 2, 3, 5, 6, 7 and 8 as photographs of the car and crime scene.
On March 15, Mr. Case received from Townsley the burned quilt, Bible, and liquid from the car floor. An examination for inflammable accelerants was unsuccessful, as none were found. On March 16, 1977, Case, Rabren, and Wallace went to the Homer Johnston residence and took samples of brake fluid, motor oil and diesel fuel. These items were compared with the residue removed from the floor of the car. Analysis showed that all of the products had an oil like base, but there was no chemical identity established in the tissues. Mr. Case also received on that occasion from Dr. Rabren a sample labeled "soil from the defendant's shoe." A comparison of this sample with soil taken near the automobile showed that the two samples were similar in color and texture but were different in density. Rabren also turned over to Case three plastic bags containing clothing fragments and two rings. Case identified State's Exhibit 9 as the rings he received. Case testified that the rings were in his exclusive possession and control from March 16, 1977, until September 15, 1977, when he turned the rings over to Gary Carroll of the Anniston Police Department.
Case stated that he did not know whether the interior was naugahyde or not, but that naugahyde would leave an oily like liquid. He also stated that a sample of the fluid from the lighter fluid can was dissimilar to the residue in the car and clothing of the victim. Finally Case stated that he was unable to determine whether or not the soil sample from the defendant's shoe came from where the car was found.
Eugene Grimes works for Liberty National Life Insurance and is in charge of policy records. He has worked for Liberty National for 22 years. The policy records reflect an application for a policy by Homer Johnston which was dated August 31, 1976. The policy, number 2278180, had a coverage of $50,000 with $50,000 accidental death benefits. The defendant was the original beneficiary on the policy which insured the life of the deceased. The policy was issued and became effective on September 21, 1976. The policy lapsed on November 21, 1976 and reinstatement was applied for on January 24, 1977. This application was not properly treated by the company and another application was mailed to be completed, inferentially by the defendant. This application was signed on February 24, 1977, and was actually approved by an underwriter on March 7, 1977. Notice of the reinstatement was mailed to the defendant on March 8, 1977. The company received notice of death on March 16, 1977.
Mr. Grimes stated that a policy, number 2278179, was issued with an effective date of September 21, 1976, on the life of Homer Johnston, with Ida Jane Johnston as the beneficiary. This policy, which was also for $50,000, lapsed on November 21, 1976, and an application for reinstatement was made *896 on January 24, 1977. This policy was approved on February 4, 1977, and notice was mailed on February 24, 1977. Grimes stated that policies frequently lapse. The premiums on the two policies were $84.40 and $109.90, respectively.
Ms. Rhonda Barnhill is 22 years old and has lived in Jacksonville for about three years. She works intermittently at Classe Ribbon and has worked there for the past year. She was employed by Classe Ribbon in March of 1977. She could not remember the date that she last saw the deceased but could remember what occurred on that day. Her mother was changing shifts and as a farewell gesture a covered dish supper was held for her at the plant that night. She stated the deceased was present and had prepared coleslaw, which was in a round white bowl with some flowers on it. She identified the State's Exhibit 14 as looking like the bowl in question. She stated that the police had shown her pictures of various bowls and that she had indicated to them a picture of a bowl like State's Exhibit 14.
William H. Landrum is an employee of the Department of Forensic Sciences and his duties include typing blood samples. He has a Bachelor of Science degree in Laboratory Technology from Auburn University with courses in chemistry, serology, biochemistry, immunology, immunohematology, anatomy, histology and micrology.
On September 27, 1977, he received a blood sample from Dr. Rabren for analysis. The blood was determined to be Group B and was identified as being from Jane Johnston. Landrum testified that Group AB blood occurs in about 4% of the population; Group B in about 10% of the white population and about 21% of the black population; Group O in about 45% of the white population and 48% of the black population; and Group A which occurs in about 44% of the white population and 27% of the black population.
At this point the State offered the prior recorded testimony of Clyde Eugene Collins. The defendant objected upon the grounds that no proof of the unavailability of the witness had been shown. Testimony was heard outside the presence of the jury and the trial court overruled the objection and allowed the testimony of Collins into evidence.
Collins, at the time of his testimony, lived at 209 West 43rd Street, Saks. The defendant is his uncle, his mother's brother.
Collins testified that, two or two and a half months before, roughly the last of July or early August, he talked to the defendant on Weaver-Cave Road, about a block from Fink's Lake. The defendant was parked on the right side in a pickup truck, headed toward Weaver. Collins stated that he was headed toward Saks in a 1972 Ford. He stopped the car and approached the defendant. The defendant had been drinking and Collins saw alcoholic beverages in the truck. Collins had been drinking also, about 6 or 7 beers. During the course of the conversation Collins said to his uncle, "Homer, you know you killed Jane." According to Collins, Johnston stated momentarily, "What if I did?" and subsequently added, "They will never convict me anyway." Then the defendant allegedly said that he would "get" anyone who testified against him. Collins testified that he (Collins) had been convicted of buying and concealing stolen property seven years ago.
Maria Baldwin of Eulaton is an employee of Classe Ribbon having worked there for over two years. She was so employed on March 13, 1977, and knew the deceased whom she last saw on that night, when a covered dish supper was held for Lena May Hodge as previously noted. She testified that the deceased prepared coleslaw which was contained in a bowl identical to State's Exhibit 14.
Ms. Baldwin testified that there was a labor union at Classe Ribbon of which she was not a member. She testified that though she was not employed at Classe Ribbon during the organizational stages of the union, she had been told about "different details" concerning violence that had occurred. She said that she had been told that Peggy Moore's car had been burned "close by" to where the Johnston car was burned.
*897 Ms. Baldwin stated that the deceased was wearing the defendant's tan coat on the night of March 13, 1977. She stated that she couldn't say whether the deceased was wearing any green corduroy clothing. She testified that the deceased was nervous and upset that night and that she noticed her demeanor when she first arrived. Ms. Baldwin stated that the deceased became more nervous as the evening progressed. "She just seemed more upset. It seemed like the later it got the more upset she was." Ms. Baldwin felt ill that night and left the plant at about 7:00 p. m.
Ms. Waylene Brown testified that, on Wednesday, after the fire, she went to the Johnstons' home. She stated that while she was there she found a bowl, State's Exhibit 14, in the refrigerator, containing about a cup of coleslaw, mixed with red and green cabbage. She stated she went back on Thursday, obtained the bowl and delivered it to the detectives' station at the Police Department. She gave the bowl to one of the secretaries there.
Lola McFall of 2721 Simpson Street is the mother of the deceased. She stated that two or more years ago she gave her daughter a set of bowls. She stated that she gave her daughter the bowl marked State's Exhibit 14 as one of the set of four bowls. The bowls were of different colors and designs with one bowl larger than State's Exhibit 14 and two smaller. She stated that she did not know whether her daughter still had the bowl in question at the time of her death.
Mrs. McFall said that she saw the defendant on Sunday, March 14, 1977, and that he told her that he did not know whether the burned corpse was that of his wife or not. The defendant and the deceased had lived with Mrs. McFall for about two months previously and she did not observe any marital difficulties between them. Mrs. McFall indicated that the defendant called her on Thursday before her daughter's death and said that the deceased had told him that she was going to get a divorce.
Mrs. Waylene Brown testified that, when she went to the defendant's house to get the bowl, the defendant asked her if she thought that he was responsible for his wife's death. She replied that she did not know but intended to try to find out who was responsible.
Mattie Underwood is the sister of the deceased and of Waylene Brown. She, Brown, Lorene Hill and Fay Underwood, Mattie's mother-in-law, went to the defendant's home on Thursday afternoon after the funeral. She said that when they arrived the bowl, State's Exhibit 14, was being washed and "I believe my mother-in-law dried it." Mattie testified that the defendant wanted to know why they wanted the bowl and that he further said that he knew they were trying to say that he had done it. Waylene got the bowl and replaced the contents which had been removed. Waylene Brown then took the bowl to the detectives' station.
Gary Carroll is a Lieutenant with the Anniston Police Department. He was a Sergeant on March 13, 1977, assigned to the investigator division when he received a call at his residence to investigate a burned car on Winchester Road. He was told that there was a body in the car. When he arrived upon the scene, the car was not burning and he inspected the car briefly.
After the inspection, Carroll returned to the Police Department. The defendant was there and he stated that he wanted to report a missing person, Ida Jane Johnston. The defendant described his wife as a white female, 38 years old, about 5 feet 6 or 7 inches, about 140 pounds, with blue eyes and short light brown hair. She was described as wearing work clothes. The defendant told Carroll that the last time he saw his wife was at 2:00 p. m. on March 12, 1977, Saturday. She called him at home between 9:30 and 10:00 p. m. and said she would be home shortly. The defendant told Carroll that she worked at Classe Ribbon and had called from work. Carroll said her car was described by the defendant as being a blue Ford Galaxie, two door, with a black vinyl top, with a Calhoun County tag. Carroll had obtained a tag number from the burned car and had determined that it was registered to Ida Jane Johnston.
*898 Carroll asked the defendant about his actions when his wife didn't return that night. The defendant said that he thought she was at the hospital with the defendant's sister. The defendant further stated that he went to the hospital that morning to look for his wife and when she wasn't there, he called her mother. The defendant told Carroll that he awoke at 5:30 a. m. and went directly to the hospital. The defendant told Carroll that he had two children, ages 13 and 17, respectively, and that the younger girl was with the older girl and her husband in Jacksonville that night. The defendant told Carroll that he was alone that night, watching television at home. In addition to going to the hospital, the defendant told Carroll that he had gone to his daughter's home that morning to look for his wife. The defendant said his wife had never stayed out all night before.
Carroll told the defendant about the burned out car and about the unidentified body. After defendant heard this, Carroll said, ". . . he seemed emotionally disturbed or upset. He got up and went into the bathroom and put some water on his face and took a couple of paper towels and dried his face off and came back into the office and sat down." After the defendant sat down, he gave Carroll additional information such as his in-laws' names and addresses, the possible amount of money and jewelry the deceased might have in her possession, etc. The defendant stated his wife had about $200 to $250, a white gold wedding band, and a diamond engagement ring.
Carroll participated in the search of the defendant's residence pursuant to a search warrant on March 16, 1977. During this search the previously mentioned samples of brake fluid, diesel fuel, etc., were obtained. This search took place at 3:50 p. m. The defendant was warned of his constitutional rights, and the Miranda warning was read to him from a card. The defendant was neither coerced or threatened, nor were any promises, rewards or other inducements held out to him to induce a statement, nor did he ask for an attorney. Carroll said:
"A. He stated that he was home on the night of March the 12th, 1977. His older daughter Judy came over to his residence around eight o'clock P. M. He said Judy stayed a while and left somewhere between 9:00 and 10:00 P. M. taking his younger daughter Annette with her. After the two daughters left he then received a telephone call from his wife some time around 9:00 to 10:00 P. M. and that he was alone at the residence. He stated that no one else came to his residence that night. He told me he watched television that night and then went to bed. I asked him what program he watched on television and he stated that it was a program by the name of Dog and Cat. I asked him what the program was about and he stated that it was about a rapist who kidnapped a woman police officer near the end of the program."
Carroll determined that the show was indeed shown between 9:00 p. m. and 10:00 p. m. on March 12, 1977.
Carroll next talked to the defendant on April 26, 1977, in the detective's office at the Police Department, at about 3:20 p. m., and the defendant was again apprised of his constitutional rights and the Miranda warning was read to him from a card. No promises, rewards, threats, coercion or other inducements were used to cause the defendant to give a statement. He stated that he understood his rights and he did not ask for an attorney.
Carroll asked the defendant a number of questions. The defendant stated that his wife normally drove the car but that he had driven it the week before in order to have a tire repaired. Defendant stated the jack was in the trunk of the car. Carroll asked, "In other words, the last time you saw the jack it was in the trunk of the car?" The defendant did not reply. The defendant was asked about the coleslaw prepared by his wife to carry to the covered dish supper. He said, "Yes, she left some of it here at home for me and my daughter." When the defendant was asked if he knew what dish his wife carried to the supper, he stated, "No, not really. She was talking about *899 take it in hershe took somethey had a lunch before then and she had taken some of her Tupperware up there and she didn't get it back. So, then, she didn't know whether to take any of it back or just take a cheap bowl or what she was going to take." The defendant said that he had not noticed the dish finally taken.
Carroll then showed the defendant a picture of the bowl, State's Exhibit 14, which Carroll had obtained from Waylene Brown at the Police Department on March 17, 1977. Carroll turned the bowl over to Gilmore, an evidence technician. Before coming to court, Carroll retrieved the bowl from the Police Department Property Clerk. The defendant identified the bowl and said he did not know how many his wife had because she owned a set of them.
On that occasion Carroll asked the defendant what time his daughter left the house that day. The defendant could not remember what time of the day his daughter left the house. At some time that day defendant stated that he picked up his daughter and her husband. The defendant could not remember who prepared the meal. About 8:00 p. m. the decedent called the defendant on the telephone.
After his daughter, her husband, and the defendant's nieces left that evening the defendant stated to Carroll that he stayed around the trailer. The defendant told Carroll he may have gone into the yard but couldn't really remember. The defendant told Carroll that the decedent called again between 9:00 and 10:00 p. m. According to the defendant, he and the decedent discussed his sister who was in the hospital. Decedent talked about visiting her but the defendant told her that it was too late. The decedent also wanted the defendant to bring her a barbeque sandwich though she changed her mind.
The defendant told Carroll that he went to bed at about 10:00 p. m. or a little after but awoke about 3:00 a. m. He said his wife was not there at 3:00 a. m., but that he thought she must have gone to the hospital. The defendant awoke again at 5:00 a. m., when he got up and made some coffee. About 6:00 a. m., he went to the hospital hoping to find his wife. He stayed there some 15 or 20 minutes and then went to his oldest daughter's house hoping to find his wife there. When his wife was not at either place, the defendant carried his youngest daughter and the two cousins back to his house. When he arrived home, defendant phoned the hospital to see if his wife had appeared. She had not, and he decided to go to the hospital a second time. Finally, the defendant went to the police station where he was told the police couldn't accept a missing person report for a period of 24 to 48 hours.
Carroll testified that he asked the defendant about some life insurance policies, one on the defendant, and one of them on his wife. The defendant stated that the policies, which were in the amount of $50,000 each, had not lapsed. The premiums for their policies were about $100 and $80 respectively, and that he did not have any problems making the payments. Carroll did not recall whether he asked the defendant about possible marital discord.
Carroll identified State's Exhibit 9 as having been in his exclusive possession from September 15, 1977, when he received it until the period of December 5, 1977, when the exhibit was in the property office. State's Exhibits 9 and 14 were admitted into evidence. Carroll testified on cross-examination that he initially received the rings on September 15, 1977, from J. G. Wallace. Carroll kept them in his possession until September 27, 1977, when they were turned over to Lieutenant Hines. Carroll retrieved the rings from the property office on December 5, 1977, and brought them to the court.
According to Carroll, the defendant told him that Howard Rich had called the deceased "trying to stir up trouble" relating to Union activities at Classe Ribbon. Carroll further stated that the defendant had expressed the belief that Rich had either burned the car or had had it done.
Carroll checked with a Mr. Bodenheimer of the Classe Ribbon personnel department and obtained a list of the people who *900 worked the night of the incident. Carroll also determined from Classe Ribbon records that the deceased clocked out at approximately 10:59 p. m.
Carroll testified that Rhonda Barnwell was interviewed on March 18, 1977, and she picked a picture of the bowl out of a total of five pictures depicting five bowls as being the bowl carried to the supper by the decedent.
Testifying further, Carroll stated that the defendant appeared nervous when he came into the police station on that Sunday morning. When Carroll informed the defendant about the burned car and body, the defendant "... just stopped and appeared to break down and cry." The defendant ". . . went to the bathroom and put water on his face and took a towel." Carroll said he appeared to be shaken and that Carroll suggested that he not drive; a friend of the defendant was called to drive him home. Carroll did not observe any signs of ". . . fight, scrapes or burns or anything . . ." about the defendant.
The defendant offered the following testimony in his behalf.
Ruby Collins of Saks is a sister of the defendant. Clyde Eugene Collins, whose prior recorded testimony was introduced by the State, is her son. Mrs. Collins stated that she was familiar with her son's reputation in the community for truthfulness. She stated, "When he was drinking he would tell untrue things," and that she would not believe her son under oath. On cross-examination she stated that, even when her son was sober, she would not believe him every time.
James Collins of Anniston, also the son of Ruby Collins, is the brother of Clyde Eugene Collins. James Collins knew of his brother's reputation in the community for being truthful. He stated his brother has the reputation of being untruthful. James Collins stated that he would not believe Clyde Eugene Collins under oath. He said he believed his brother ". . . on simple things."
Mrs. Ruth Vinson of Route 4, Parkwood Drive, Anniston, works as a toll operator for South Central Bell. She was so employed during March of 1977. She lives about a block from where the road turns to approach the defendant's residence. On Saturday, March 12, 1977, she left her job at the phone company at 10:45 p. m. arriving home at about 11:05 p. m. She did not leave her home and went to bed some 40 or 45 minutes after arriving home. She did not remember hearing any cars or trucks turn in so as to approach the defendant's residence. The Vinson family has some dogs, but they did not howl or make any commotion that evening. Mrs. Vinson stated that she cannot see the defendant's residence from her house and that it is possible for a car to go to the defendant's residence without her hearing it.
Arlene Johnston is married to Preston Johnston, a son of the defendant. She and her husband were living in Texas in March of 1977. They returned to Alabama when they learned of Mrs. Johnston's death. Arriving on Monday following the death of Mrs. Johnston, Arlene Johnston saw the bowl in question at the trailer. On Thursday she emptied the bowl of its contents, coleslaw, and washed it, during a general cleaning of the trailer. One of Arlene's relatives took the bowl with her.
Preston Johnston is the defendant's stepson. Preston was present at the trailer when Waylene Brown obtained the bowl from the kitchen. Preston had no knowledge of his parents having a green corduroy coat or pants. On cross-examination Preston was not certain if the bowl at trial was the bowl that was taken by Waylene although they were "pretty similar." He stated that his father owns a blue jean coat.
Connie Hill is a daughter of Lorene Hill, a sister of Ida Jane Johnston. Connie stated that her cousin Annette, the defendant's daughter, spent the Friday night prior to the incident with her. On Saturday, Annette, Connie and Vicky Hill went to the defendant's home. The defendant was there when they arrived. The three girls later went to the home of the defendant's *901 eldest daughter to spend Saturday night. Connie testified that the defendant did not suggest that they do so. The girls ate supper at the trailer prior to leaving. Connie was not sure if she saw the bowl or not, saying, "I think it was in the refrigerator, but I'm not sure." She did not see any coleslaw. Connie stated she told Carroll that there was a white bowl with pink flowers in the refrigerator with coleslaw in it and that she had so previously testified. Connie stated that they left the trailer at about 9:00 p. m. and didn't see the defendant again until early the next morning when he came to pick up the three girls. The defendant carried them to the trailer.
Vicky Hill, Connie's cousin, is 16 years old. She went with Annette and Connie to the defendant's trailer on Saturday afternoon before the car burned. The defendant picked up the three girls and carried them to the trailer where they stayed until about 9:00 p. m. Upon leaving they went to Judy Kiker's house. Judy is the defendant's eldest daughter. Before leaving, the girls asked for the defendant's permission to do so. He would not grant permission without his wife's approval. The girls called the deceased after 6:00 p. m. and she consented. Vicky testified she saw the bowl in the refrigerator when she was getting a glass of Kool Aid to drink. She stated the bowl had a Saran Wrap cover and was half-way filled with coleslaw.
On cross-examination Vicky was asked whether or not she had previously said to Officer Carroll that she didn't remember seeing the bowl in the refrigerator. She answered, "I might have. After I told him that I went outside and I remember I had seen it and I had moved the bowl." She was also asked whether or not she had previously stated to Carroll that she had not looked in the refrigerator at all. Vicky answered, "I don't remember anything I talked to Carroll about."
Vicky stated that after leaving the defendant's home on Saturday night, she did not see him again until early the next morning, about 6:00 a. m., when he came to the Kikers' trailer. The defendant stayed at the Kikers' trailer for about an hour and he then took the three girls back to his trailer. When they arrived at the trailer, the defendant remained for a while before going to the hospital.
Hugh Farrow, Jr., a mechanic from Bynum, is married to the defendant's sister, Evelyn. He described the relationship between his wife and the deceased as ". . . very, very, close." Evelyn Farrow was the aforementioned sister who was a hospital patient during the weekend of the incident in question. She entered the hospital on Friday, March 11, 1977, having been taken there by the deceased. Mr. Farrow spent Friday night at the hospital and left at about 10:00 or 10:30 a. m. He returned on Saturday afternoon and remained through Saturday night. Mr. Farrow testified that the deceased called him at the hospital shortly before the switchboard closed.
Mr. Farrow testified that while he was with his wife Saturday night he ". . . dozed some . . ." but was awake whenever the nurses came. He testified that between 11:00 and 11:30 p. m., ". . . or something like that . .", he heard a woman scream in the back parking lot behind the hospital. Mr. Farrow testified that the defendant came by the hospital about 6:00 Sunday morning, looking for his wife. Mr. Farrow did not see the defendant Saturday night. The defendant appeared anxious and concerned for his wife's whereabouts. After a few minutes the defendant left for his daughter's house. The defendant had on fresh clothes, appeared ". . . cleaned up . . ." and did not have any marks or scratches on him.
On cross-examination the witness, Mr. Farrow, stated that the hospital window was open to allow fresh air to enter. He stated that his wife's room was in the back of the Regional Medical Center. He stated he did not hear any ambulances but could hear horns and other loud noises.
On redirect examination Mr. Farrow testified that some of his prior testimony was confused because he was tired. He stated *902 that the defendant came back to the hospital at about 9:00 and was still present when Farrow left between 10:00 and 10:15 a. m.
William Charles Kiker is married to the defendant's eldest daughter, Judy. On March 12, 1977, he and his wife went to the defendant's home to pick up Annette Johnston, the defendant's younger daughter. They arrived at about 7:00 p. m. and remained until about 9:00 p. m., or later. They ate supper, having fried chicken and things ". . . like bread and beans. . ." He stated that he saw the bowl in question on the top shelf in the refrigerator, containing coleslaw and covered with Saran Wrap. He stated that the bowl was approximately half full.
On cross-examination Kiker was unable to describe the color of the coleslaw. He also stated he did not notice any other bowls which might have been in the house or the refrigerator.
Annette Johnston, the defendant's youngest daughter, testified in her father's behalf. She is 16 years old and always lived with her parents and was so living in March of 1977. She spent Friday night with her cousin Vicky and Connie, going home at about 3:30 p. m. Annette remained at her father's trailer until about 9:00 or 9:30 p. m., when she left with Judy and her husband. She intended to spend the night with them. Annette stated that they ate a supper of chicken, mashed potatoes, coleslaw, porkchops, rolls and salad. She stated that she saw the bowl in the refrigerator containing coleslaw and covered with plastic wrap. Annette said the bowl was about half full. She stated her father arrived at her sister's home on Sunday at about 7:00 a.m. Annette returned to her father's trailer with him. She stated that it was not her father's idea for her to stay with her sister that Saturday night.
Judy Kiker, the defendant's eldest daughter, is 19 years old. She and her husband arrived at the defendant's trailer at about 7:00 to pick Annette up. They stayed for about two hours watching television and eating supper. Defendant, Judy, William, Annette, Vicky, and Connie were present. Judy stated she saw the bowl in the refrigerator half full of coleslaw and covered with Saran Wrap. They left about 9:20 and went straight home. Judy did not see her father again until the next morning when he came to the trailer, worried about his wife. Judy did not observe any signs of a scuffle or fire about her father's person. She stated no one in her family owned a green corduroy coat or pants. Judy was present at the defendant's trailer when Waylene Brown took possession of the bowl on the following Thursday. Judy testified that she ate chicken, mashed potatoes and rolls for supper that night, and that she got tea and Kool Aid out of the refrigerator to drink. She stated that the bowl was a part of a set and that all of the bowls to the set were present.
The defendant, Homer Lee Johnston, testified in his own behalf. He stated that he had been married to Ida Jane Johnston for a long period of time. "This June would have been twenty years." Their marriage was his first and her second. Preston Johnston is her son by her first husband, but the defendant adopted him when he was about 5 years old. He stated that he did not kill his wife. The defendant wears a size 9 shoe and has not smoked cigarettes in about five years. He stated neither he nor any member of his family owned a green corduroy coat or pants.
Some years before the defendant and his family had moved to Texas. They returned to Alabama in the summer of 1976. Before they moved to Texas, the defendant had some 20 life insurance policies with Liberty National. He had some insurance on himself, his wife and his children. The premiums, amounting to about $100, were collected monthly by an agent of Liberty National while the Johnstons were in Alabama. When they moved to Texas, the defendant was to mail in the payments. He did not do so and apparently some of the policies lapsed. When he returned to Alabama, he contacted his agent, Richard Stubbles, about some additional insurance. A program of insurance coverage was presented to the defendant for his inspection and he *903 agreed to purchase a $50,000 whole life policy with a disability waiver and double indemnity provisions. The defendant was owner of the policy. He purchased two policies, one insuring his life, and one his wife's. He was the beneficiary of the policy insuring his wife, and she was the beneficiary of the policy on his life. He was to mail the premiums to the company and to the best of defendant's knowledge the policies never lapsed, although he may have gotten behind on the payments.
Defendant testified that he had never been on the trails described by Officer Carroll. He stated that he arrived home on Saturday, March 12, 1977, at about 2:00 p. m. His wife was home but left shortly thereafter. Defendant stated that after his wife left for work he puttered around the house. He went to get Annette about 3:00 and brought her and her cousins to the trailer. The defendant stated that Judy and William came to the trailer around 7:00 p. m. and left between 9:00 p. m. and 9:30 p. m. He stated he saw the bowl at the trailer because his wife prepared coleslaw for the covered-dish supper and left some in the bowl for the family's supper. After his daughters and others left the trailer, he watched television and talked with his wife by phone.
The defendant said that he first realized his wife wasn't at home about 3:00 a. m. when he awoke. She had talked previously about going to the hospital and he stated he assumed that she had gone alone. About 5:00 or 5:30 a. m. the defendant got out of bed and made some coffee. He went to the hospital and then to his daughter's house looking for his wife. He picked up the girls, took them to the house and then went to his other sister's home, to take her (Ruby Collins) to the hospital. He arrived there around 8:00 or 8:30. When he left the hospital the second time he went to the police station where he talked with Officer Carroll.
Defendant testified that he did not threaten to kill his nephew, Clyde Eugene Collins. He also denied that his nephew confronted him and accused him of killing his wife. After the fire the insurance agent contacted him out of courtesy.
On cross-examination the defendant stated that he operated heavy equipment during March of 1977 and that monthly debt installment payments totaled about $1,100. He stated that though his payments were not up to date in March of 1977 he was not in a financial bind. His wife's income amounted to $70 to $75 per week.
Defendant stated he was unaware of any lapse of the policies and any reapplication therefore. The defendant stated that a payment was made pursuant to the policy on his wife. He identified a check payable to Homer L. Johnston, Judy Kiker and Billy P. Johnston in the amount of $100,000 that he endorsed. He further stated that the children received the money from the policy which amounted to $70,000.
Evelyn Farrow is the defendant's sister. She entered the hospital on Friday, March 11, 1977, and remained for about a week and a half. On March 12, 1977, she did not see or hear from the defendant. Deceased did call and she talked with Mr. Farrow. Mrs. Farrow stated that the defendant came to her room about 6:00 or 6:30 on Sunday morning. She did not observe any signs of a fire, scuffle or fight about his person.
Mrs. Farrow knows and works with Rhonda Barnwell. After the court limited her testimony to impeachment, Mrs. Farrow testified that Rhonda Barnwell told her, "She said she didn't know why they had her up here that she knew nothing about it. She didn't know one bowl from the other. . . She said they showed her a bunch of bowls and she didn't know one bowl from the other."
A. W. Bolt is the attorney for the defendant representing him in the present proceeding. Bolt testified in behalf of the defendant. He stated that the prior evening he went to Classe Ribbon when he spoke with Rhonda Barnwell. Bolt testified that Barnwell said that she had not ever seen the bowl before it was shown to her in the courtroom. Bolt said:

*904 "I asked her if that was the bowl and she said that she did not know. I asked her if the District Attorney had pulled a bowl out of a sack that was like it that had gold flowers on it would she have said the same thing and she said yes. I said what if the District Attorney had pulled a bowl out of the sack that had blue flowers on it would you have said the same thing and she said yes. I said didn't you tell me in December of 1977 that you could not identify that bowl and she said yes. I asked her why she had said she had never wanted to get involved in the thing and didn't know what bowl was there that night, I asked her to come here today at 1:30 and she agreed to come and she is not here."
Appellant raises several issues in this appeal contending that reversible error was committed during his trial. As we have pointed out he made a motion to exclude the State's evidence for failure to make out a prima facie case. He also requested the affirmative charge and he filed a motion for a new trial on the ground, among others, that the evidence was insufficient to sustain the verdict.
Under our view of this case we do not deem it necessary to address all the issues raised by appellant. We have read, and reread, the three volume record in this case and are clear to the conclusion that the evidence is insufficient upon which to hinge a conviction.
Appellant may be guilty of this horrible crime but there is not a single thread or glimmer of evidence tending to connect him with the burning death of his wife. He had a motive in bringing about her death, and maybe the opportunity, but there is absolutely no testimony placing him anywhere near her automobile prior to or at the time of the fire. There is no evidence as to the cause or origin of the fire. The experts who painstakingly examined and sifted through the automobile and its contents could not find any accelerants that could have contributed to the origin of the fire. A conviction cannot be predicated upon suspicion, surmise or conjecture.
It is settled law that a conviction may be had on circumstantial evidence but it is not sufficient to support a conviction if it does not exclude to a moral certainty every other reasonable hypothesis but that of the guilt of the accused. It cannot prevail unless it is so strong that it cannot reasonably be reconciled with the theory that the accused is innocent.
This case is controlled by the pronouncements in Graham v. State, Ala.Cr.App., 374 So.2d 929, writ quashed, Ala., 374 So.2d 942, wherein Judge Clark held:
"The test we are to apply is not whether we think that appellant is guilty. A verdict finding a defendant guilty in a criminal case is wrong and unjust, even though defendant is guilty, if the evidence of his guilt is not strong enough to meet the legal test required as stated above. Such a verdict, when properly challenged, cannot stand, even though there is strong reason to believe that if all of the true facts were known and shown in evidence guilt would be conclusively established."
After giving the trial court the favorable presumption to which it is entitled, we conclude that, irrespective of whether appellant is guilty, the verdict is so contrary to the weight of the evidence that it is clear the the verdict is palpably wrong and unjust. By so holding we do not say that there is disagreement between us and the jury as to the guilt of defendant, but that the verdict is palpably wrong and unjust by reason of the extent of its contrariety to the weight of the evidence now before us. The defendant's motion for a new trial should have been granted."
See also Gantt v. State, Ala.Cr.App., 356 So.2d 707, certiorari denied, Ala., 356 So.2d 712.
The circumstantial evidence in Graham and Gantt, supra, was much stronger in pointing toward the guilt of the defendants when compared with the evidence in this case.
The judgment of conviction is hereby reversed and judgment here rendered, discharging *905 appellant from further custody in these proceedings.
REVERSED AND RENDERED.
HARRIS, P. J., and DeCARLO and BOWEN, JJ., concur.
TYSON and BOOKOUT, JJ., dissent with opinions.
BOOKOUT, Judge, dissenting:
My dissent is based upon the admissibility vel non of the prior recorded testimony of Clyde Eugene Collins from an earlier trial of the appellant. Collins' testimony was definitely incriminating to the appellant. If that testimony was properly admitted in the instant trial, it may have been strong enough to support an inference of guilt thereby upholding the jury verdict. On the other hand, if Collins' prior testimony was inadmissible in the instant trial, the court was in error in admitting it into evidence and the case should be reversed and remanded only rather than rendered.
In my opinion the State failed to lay a proper predicate to show Collins was unavailable as a witness in the instant trial pursuant to the requirements set out in Williams v. Calloway, 281 Ala. 249, 201 So.2d 506 (1967), and cases cited therein. See also: Gamble, McElroy's Alabama Evidence, § 245.07(8), (3rd ed. 1977). I would therefore reverse and remand on that ground rather than on the insufficiency of the evidence. The State would therefore have an opportunity to retry the appellant and to seek out Collins and use him as a live witness or, after a proper predicate showing his unavailability, proceed again on his prior recorded testimony. This issue is not treated in the majority opinion and is crucial to the case. Whether Collins is or is not a reliable and believable witness is an issue going to the weight and credibility to be given his testimony by the jury rather than going to its admissibility. Either Collins should testify personally or, if he is in fact unavailable, after a proper predicate, his prior testimony could be considered by the jury. In either case his testimony may be sufficient to support a guilty verdict.
TYSON, Judge, dissenting:
I join in Judge Bookout's dissent. I also am of the opinion that the State of Alabama should be given an opportunity to retry the appellant and show any other incriminating evidence.