PATTERSON, Presiding Judge.
Paul Anthony Johnson was convicted for the murder of his wife, Frances Elizabeth Johnson (Ala.Code § 13A-6-2 (1975)), and was sentenced to life imprisonment.[1] He appeals, raising six issues for review. The appellant’s primary issue is whether his motions for a judgment of acquittal, made at the close of the state’s case-in-chief and at the conclusion of all of the evidence, were erroneously denied because, he argues, evidence failed to both prove his guilt beyond a reasonable doubt and to exclude every reasonable hypothesis except that of guilt.
The evidence, presented by both parties, tended to establish the following facts based on the known circumstances of the crime and the ensuing investigation.
During the early morning hours of July 26, 1984, the body of Frances Elizabeth Johnson, hereinafter “the victim,” was found in the bedroom of the home she shared with the appellant. She was nude, and a towel was draped across her chest. She had been severely beaten about her face and body, strangled, and repeatedly stabbed in the chest. The bedroom had been ransacked; the dresser drawers had been pulled out; and clothing had been scattered about. The victim’s class ring and wedding band, which she normally wore, were missing. However, she was wearing a gold necklace when her body was discovered. The appellant subsequently reported to the police that $600 in cash was missing from her checkbook, which was on the kitchen counter.
Diane Nance, a coworker of the victim, last saw the victim alive when the two of them returned from work at 1:40 a.m. on the date of the homicide. As Nance drove away from the victim’s house, she observed the victim calling her dog, and she heard the dog barking in the distance.
*1246 At approximately 3:00 a.m., the appellant arrived at his parents’ house. He was visibly upset, and was screaming and hollering. The appellant’s father called the sheriff’s department and informed someone that there had been a burglary at the appellant’s home and that his wife had been hurt. (However, the dispatcher’s log book does not have a notation regarding this call.) The appellant and his parents then drove to the appellant’s home. While the appellant and his mother waited outside, the appellant’s father went into the house, felt for the victim’s pulse and, finding none, concluded that she was dead. He returned and told his wife and son to go to a neighbor’s house and to call the police. They went to the house of Monroe Har-crowe and called the sheriff’s department. The records of the dispatcher show that this call was received at 3:15 a.m.
As a result of this call, Sheriff Louie Coleman went to the scene. When he arrived, he observed the appellant, the appellant’s parents, and several other people outside the house. He noticed that the appellant was wearing blue jeans, but that he was not wearing a shirt or shoes. He entered the house and observed the victim’s body. He could find no pulse when he touched the body. He noticed that a towel was draped across the upper portion of the body, covering her chest. He additionally noticed blood running from her mouth and bruises on her face and neck. It was obvious that the victim had been severely beaten about the face, neck, and chest area, strangled, and stabbed three times in the upper body region. A butcher’s knife was on the floor next to the body. The tip of the knife was missing, but was later found embedded in the carpeted floor beneath the body.
A subsequent examination of the body indicated that two of the stab wounds penetrated the entire body. The third stab wound did not penetrate the entire body; however, the knife struck the aorta, causing the victim’s death.
Officer Stephen Michael McBride, chief deputy for the Pickens County Sheriff’s Department, arrived at the appellant’s house at 4:00 a.m. After observing the position of the body, he considered the possibility that the victim had been raped. However, he noticed that the pubic hair was dry and that the vagina was closed. He did not see any type of fluids in the area of the vagina or on the floor. Anal and oral swab samples taken from the body did not reveal the presence of semen. However, a vaginal swab sample did reveal the presence of semen. Although the presence of semen was detectable, there was not a sufficient amount for the state’s expert to determine the donor’s blood type and secretor status. Officer McBride’s closer examination of the body at the scene revealed the presence of three dark marks. Two of these marks were located in the area where the upper thighs meet the pubic hairline, and they were approximately the size of a quarter. The third mark was on the victim’s left hand. Subsequent expert examination of these marks indicated the presence of microscopic metal filings. The composition of most of these metal filings was 85 to 95 percent iron. Samples taken from the appellant’s places of work revealed similar metal filings of like composition. However, several of the metal filings found on the victim’s body contained trace elements different from the metal filings gathered from the appellant’s places of work. The state’s expert concluded that the microscopic filings from the body could have come from any shop that handled similar metal, and he was unwilling to conclude that the filings found on the victim came from the appellant’s places of work. The expert could not determine how long the metal filings had been on the victim. He noted that metal filings can be difficult to wash off. In fact, he had examined a laundered towel, taken from the appellant’s house, that still contained metal particles. Examination of the fingernail scrapings taken from the victim’s body showed nothing significant except paint from.the door frame of the walk-in closet.
At the scene, the investigators also recovered six Negroid hairs on and near the victim’s body. The one hair gathered from the body was located in the right hand. This hair was a transitional hair, which means that it was neither a head nor a *1247 pubic hair. A second hair was recovered from a piece of plastic that was located next to the body and that apparently had been torn from the plastic covering a dress which was hanging in the walk-in closet in the bedroom. Examination of this hair, a head hair, revealed that the hair follicle was still attached. The state’s expert thus concluded that this hair had been forcibly removed. The four remaining hairs were recovered from a pair of “Size 6” panties found near the victim’s body. All four hairs were head hairs. Two had been cut at the root end and two had fallen out. The two hairs that had been cut were artificially treated, causing them to lose their coloration to some extent. The artificial treatment could have been either a “bleaching process” or a “heat process such as a hot roller.” The state’s expert was not able to match any of the six hairs with any of the samples submitted to him for comparison. One of the samples submitted came from the appellant, and other samples came from some of the appellant’s coworkers. The expert was also unable to conclude that these six Negroid hairs came from the same person.
The panties, upon which four of the Negroid hairs were discovered, were blue polka dotted. The state expert’s examination of the panties revealed the presence of semen. Even though she was unable to conclude how long the semen had been present in the panties, she was able to determine that the donor was a type B secretor, the same as the appellant. Virginia Ezelle, the victim’s mother, testified that her daughter, who weighed 95 pounds and was 4 feet 11 inches tall at the time of her death, only wore “size 4,” white cotton panties and that the “size 6” panties found next to the victim’s body would have fallen off of her daughter if she had attempted to wear them.
The investigators discovered bloodstains on the carpet in the walk-in closet and around the body of the victim. These stains were from a type 0 nonsecretor, which was the type of the victim. Swab samples taken from sinks in the kitchen and a bathroom revealed the presence of blood, but were insufficient to determine the type of blood present. Several fingerprints and two palm prints were discovered in the house. Three fingerprints were detected on the telephone table in the bedroom. Although these prints could not be positively identified, they were comparable to the known prints of the victim. The two palm prints were lifted from the bedroom’s bathroom vanity and were identified as prints of the appellant's right palm. Some additional prints were lifted from the inside rear door, the vanity top, and the flashlight on the kitchen counter. All of these prints showed some similarities to the appellant’s prints, but not enough to make a positive identification. The remaining prints that were detected were not of a usable quality for comparison purposes.
Outside the house, investigation revealed no evidence of a break-in. All of the windows except two were locked. The unlocked windows, however, showed no signs of having been disturbed, except for a window screen that had been removed from one window and that was in the yard. Closer inspection of this window showed that the dust on its sill was undisturbed and that the cobwebs remained intact. The items located on the television, which was inside the house and near this window, were undisturbed. Thus, it did not appear that this window had been raised. Additional investigation revealed fresh tire tracks in the grass behind the house where an automobile had apparently travelled on the night of the crime. This was evidenced by the tracks being plainly visible in the dew.
After the initial investigation of the scene and another investigation later in the morning of the homicide, the investigators took a statement from the appellant at his parents’ house. In this statement, the appellant claimed that he had worked at his job as a machinist from 10:00 p.m. until 2:00 a.m. that morning and had arrived home around 2:45 a.m. He further asserted that the carport light was on; that the victim's car was parked in the carport; that the door to the house was open; that he walked into the kitchen and took off his shoes; that he observed, on the kitchen *1248 counter, a flashlight, which was on, with its lens down; that he turned the flashlight off; that he saw the nude body of the victim, lying on the floor in the bedroom, with something covering the top portion of her body; and that she looked like she did not have any teeth and her eyes were “walled” back. He stated that he went to the telephone, but discovered that its cord had been pulled from the wall; that he looked through the house to see if anyone was there; that he then left the house and drove to his parents’ house nearby, arriving there at approximately 2:55 a.m.; and that he aroused his parents, told them that someone had broken into his house and had hurt his wife, and sought their assistance.
During this interview with the appellant, the investigators also obtained from the appellant the clothes he was wearing when he came home from work, hair samples, and fingernail scrapings. They additionally observed that the appellant did not have any bruises or scrapes on his face and hands. A subsequent examination of his clothing revealed the presence of metal filings; however, no traces of blood were discovered.
Over the appellant’s timely objection (except as to Item 11 below), the state presented an abundance of evidence that, it argued, was relevant to prove motive, threats, and admissions of guilt.[2] That evidence is summarized as follows:
(1) Mitchell Sobley and Terry Wallace testified about a conversation they had had with the appellant at a party, during the summer of 1983, wherein he said that his wife had a “butterfly pussy,” which, he explained, was the position that his wife would lie in as they had sexual intercourse.
(2) Investigator Charles Tate testified to a conversation he had had with the appellant on the morning the victim’s body was discovered, wherein the appellant asked him, “What did you and [Officer McBride] think about Beth’s invisible bikini ... you can tell she spends a lot of time on the river.”
(3) Martha Jean Ezelle, the victim’s sister, testified that, two hours after the victim’s funeral, while sitting in the den of her parents’ house, she observed the appellant pull her cousin into his lap and heard him say “You don’t have to be scared of me, I’m not going to hurt you,” and “We’ll have to go out and raise some hell soon.”
(4) Ezelle also testified that, on the day after the victim’s funeral and while the appellant was showing her a footprint in the sand near where the victim’s dog had allegedly been tied, Ezelle said, “[Y]ou’ll never make me believe she came down here,” whereupon the appellant “went hysterical” and screamed, “[Gjoddamit, that’s what they said she did.”
(5) Ezelle, Mike Price, and Richard Bittle testified to conversations they had had with the appellant wherein he explained to each, respectively, that he did not call an ambulance because “I knew she was dead, I didn’t need to call an ambulance”; “I knew she was dead before I even went in the house”; and “I knew she was dead before I went in the house.”
(6) Cecille Tucker Brown, Charles Shelton, and Billy Steele testified to the actions and statements made by the appellant at a party the Saturday before Labor Day 1983. Brown said that, as she, her father, and the appellant were looking at her father’s old pistol, which the appellant was holding, the appellant commented that sometimes his wife made him so mad he felt like he could shoot her. Shelton testified that he overheard a conversation between the appellant and the victim wherein they were talking about a couple who was getting a divorce. When the subject of alimony was mentioned, the appellant said, “[L]et’s just get us a divorce,” and the victim responded, “[W]ell, you pay that kind of alimony and you can get a divorce.” Shelton indicated that “one word brought on another” and that as “they [were] having a few words ... [the appellant] slapped her, not hard I’m talking about, he just slapped her and when he did ... she kicked him.” Steele testified that he heard the appellant tell the *1249 victim, immediately before they left the party, that “he was going to take her home and beat up on her”; that he observed that she was crying; and that “[the appellant] told me to take her home with me and fuck her if I wanted to and bring her back to Aliceville and put her out.”
(7) Leslie Britt and Bob Guy testified that, during the early part of the summer of 1983, when asked about his married life, the appellant said that “before another woman done him like his first wife he’d kill the damn bitch” and that he would “kill her before she got what he had.”
(8) Bernard Payne, one of the appellant’s coworkers, testified that on July 25, 1984, the day before the victim was murdered, the appellant mentioned that he wanted to buy a motorcycle, but that his wife did not want him to have one. Payne further testified that, when he told the appellant, “[M]an, you work, buy you a motorcycle,” the appellant responded that he would pay somebody $10,000 to kill his wife, at which point, Payne walked away. Another of the appellant’s coworkers, Jessie Ferguson, testified that, approximately a year before the murder, the appellant asked him, “[H]ey man, do you know if I could pay somebody ten thousand dollars to kill my old lady?” Ferguson further stated that when he encouraged the appellant to divorce her rather than kill her, the appellant replied, “[W]ell, if I divorce her she’ll take every damn thing I got and, you know, I’m going to kill the son of a bitch and pay off my house and boat.”
(9) Sheriff Coleman testified to a conversation he had with the appellant after the victim’s death wherein the appellant, on his own initiative, told Coleman the following: “I guess you’ve heard a lot of the rumors going around_ Well ... one rumor [is] that I have a black baby with a black girl down in the bottom ... well, it’s true.” Richard Bittle, former brother-in-law of the victim, testified that, during the fall of 1983, the appellant told him to look at two pictures, one of a black girl and the other of a black girl holding a baby; that after he looked at the pictures, the appellant “said something to the effect that didn’t the baby look like him”; that the appellant then asked him if he “thought the black girl was good looking”; and that the appellant then told Bittle that “she was coming over to see him after [the victim] went to work.” Bittle also testified that, sometime in August 1983,
“[the appellant said] that he was having marital problems and that he wasn’t going to give a divorce to her and have a chance of her getting all his stuff and he said that he would kill her, have her killed, and asked me would I kill her.... [H]e said his brother had connections in the mob and probably could get somebody to come down and take care of it where nobody would find out about it. And he said he thought instead of having to worry about somebody blackmailing him that he could do just about anything and get away with it.”
(10) Ineal Eddins, a black woman, stated that the appellant was the father of her child, who was born on June 5, 1983. According to Eddins, she did not “have sex” with the appellant at his house after he married the victim on August 26, 1982. Further Eddins stated that she weighed 117 pounds, wore “size 4” panties, and used a “heated comb” to straighten her hair.
(11) The state presented evidence that the appellant was the beneficiary of two life insurance policies in the amount of $10,000 each on the life of the victim. The policies apparently had been in effect for a considerable period of time prior to the homicide, and one of the policies was a group policy provided by the appellant’s employer.
On the appellant’s behalf, Linda Dillard, the wife of the appellant’s employer, testified that she and her family had spent considerable time with the appellant and his wife during their marriage and had accompanied them on a trip to Florida the week before the victim’s death. She further testified that they appeared to be a happy couple and that she had not observed any hostility between them; that the appellant and his wife discussed, while in her presence in Florida, that they would *1250 like to start “raising a family”; and that she had seen the appellant working in her husband’s shop around 11:30 p.m. on the night of the homicide.
Greg Dillard, the son of the appellant’s employer, testified that he had observed the appellant working in the shop on the night of the homicide; that the appellant usually completed 12 to 15 “burners” per hour; and that the appellant had completed 51 burners that night, which, in his opinion, would have taken a “good” 4 hours of work. Jimmy Dillard, the appellant’s employer, testified that his business records showed that the appellant had completed 51 “burners” while working in his shop that night.
The appellant’s mother, Eddie Will Johnson, testified that she and her husband own the house in which the victim and the appellant lived; that there was no mortgage on the property; and that, upon their deaths, the property would go to the appellant. She identified notes from the victim to the appellant and from the appellant to the victim, that had been written on the day before the murder. In her note, the victim told the appellant that his food was in the refrigerator; the appellant, in his note, told the victim that he had to work his second job that night; and both expressed their love for each other in their notes. Mrs. Johnson described the relationship between the victim and the appellant at the time of the murder as “happy,” and she stated that the appellant had recently purchased a ring for the victim. She further stated that she had the opportunity to observe her son on the early morning hours after the discovery of the victim’s body and that she saw no marks, bruises, scratches, or blood on him.
Ms. Valla Jean Owens, a medical technologist employed at the Walker Regional Medical Center, testified that she performed testing on a vaginal swab from the victim to determine whether the donor of the semen present on the swab was a se-cretor or a nonsecretor. As earlier noted, although the state’s expert could not determine the donor’s blood type or secretor status, Owens further testified that her test revealed that the donor of the semen was a nonsecretor, and not a secretor like the appellant.
Samuel Harcrowe testified that, on the afternoon before the homicide, he observed a Chevrolet “Luv” truck in the vicinity of the appellant’s home. He testified that the truck had an out-of-county license plate, that it was driven by a black person, and that the truck had been seen several times that day by his sister. He further testified that the driver of the truck asked his son for the location of the “Paul Dill place,” which is adjacent to the appellant’s property; that, after receiving directions, the driver left; and that, when he asked Dill about the truck, Dill stated that he never saw it.
While the appellant testified in his first trial, he did not do so in his second trial.
The appellant contends that the state failed to present sufficient evidence to establish a prima facie case or to support the jury verdict of guilt and that, therefore, his conviction is due to be reversed. The question presented calls for an examination of the record, not for the purpose of weighing conflicting testimony, but to determine only whether there was sufficient legal evidence from which the jury, by fair inference, could conclude that the appellant was guilty of this murder beyond a reasonable doubt. Weathers v. State, 439 So.2d 1311 (Ala.Cr.App.1983); Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). The appellant argues that the state’s evidence presented the allegedly reasonable hypothesis that a black individual or individuals murdered his wife.
The evidence in this case is wholly circumstantial. “[A] conviction may be had on circumstantial evidence, but it is not sufficient to support a conviction if it does not exclude to a moral certainty every other reasonable hypothesis but that of the guilt of the accused. It cannot prevail unless it is so strong that it cannot reasonably be reconciled with the theory that the accused is innocent.” Johnston v. State, 387 So.2d 891, 904 (Ala.Cr.App.), cert. denied, 387 So.2d 905 (Ala.1980). “[T]he mere fact that evidence is of a circumstan *1251 tial nature does not make it deficient; circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused. Linzy v. State, 455 So.2d 260, 262 (Ala.Cr.App.1984).” Clifton v. State, 545 So.2d 173, 180 (Ala.Cr.App.1988).
“ ‘... Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires....”’
Gantt v. State, 356 So.2d 707, 712 (Ala.Cr.App.), cert. denied, 356 So.2d 712 (Ala.1978) (quoting Ex parte Acree, 63 Ala. 234 (1879)).
“In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).”
Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).
In reviewing the evidence in this case in the light most favorable to the state, as we must, we conclude that the evidence is insufficient to support the appellant’s conviction. We do not believe that the evidence is so strong that it cannot reasonably be reconciled with the theory that the appellant is innocent. In our opinion, the evidence presented by the state created no more than a mere suspicion that the appellant killed his wife. In fact, the same evidence supports a reasonable hypothesis that some other person or persons may have done the act.
We find the state’s theory, argued in brief, that the appellant and his wife became involved in an argument; that he killed her in an ensuing fight; and that he attempted to cover up his crime by making it appear that someone else did it, to be pure speculation.[3] While a jury is under a duty to draw whatever permissible inferences it may from the evidence, including circumstantial evidence, mere speculation, conjecture, or surmise that the accused is guilty of the offense charged does not authorize a conviction. Thomas v. State, 363 So.2d at 1022. The state’s reasoning in this regard is torturous and leaves many questions unanswered.
For instance, the state, in its analysis of the evidence, completely ignores the testimony of the medical technologist, Ms. Owens, that the sperm discovered in the victim’s vagina could not have been that of the appellant. The metal filings found on the victim’s body could not be positively linked to the appellant. Moreover, the fact that metal filings are difficult to wash off presents a reasonable explanation of the presence of the metal filings on the victim’s body, which is consistent with the appellant’s innocence.
On the other hand, the appellant’s theory of what occurred, e.g., that a black individual or individuals somehow gained entrance to his home, possibly raped, murdered, and robbed his wife, is a reasonable theory supported by substantial evidence. Supporting this theory is the following evidence: the Negroid hair found clutched in the victim’s hand, as well as the other Negroid hairs found in the vicinity of the body; the missing valuables; the evidence that the victim had sperm in her vagina which was not of the same type as that of the appellant; the evidence of a black stranger having been seen in the vicinity of the appellant’s house earlier in the day; the *1252 fact that, even though the evidence showed a violent assault and a struggle, the appellant had no scratches, bruises, or blood on him when he was observed shortly after the crime was committed; and the evidence supporting the fact that the appellant worked at his job from 10:00 p.m. to 2:00 a.m. While the state’s evidence of threats made by the appellant to his wife and of solicitations to have her killed do not reflect favorably upon the character of the appellant, a close reading of the testimony of the persons giving such evidence shows that, in most instances, the witnesses did not take the appellant’s remarks seriously, but considered him to be “joking” or “mouthing off.” We are inclined to regard this evidence in this light, particularly in view of the testimony that the appellant and his wife appeared to be on friendly terms at the time of the homicide. The state’s evidence offered to prove motive and to show threats, solicitations, derogatory and insensitive comments about the victim by the appellant before and after her death, his conduct after her death, and statements attributed to the appellant that he knew the victim was dead before he went into the house, considered along with all of the other evidence, creates no more than a suspicion that the appellant may have killed his wife, but not enough for us to conclude that he is guilty beyond a reasonable doubt and to the exclusion of all other reasonable hypotheses except that of guilt. We hold, therefore, that the trial court erred in denying the appellant’s motions for judgment of acquittal. The judgment of the trial court must be, and it is hereby, reversed, and the cause is rendered in favor of the appellant.
REVERSED AND JUDGMENT RENDERED.
All Judges concur.

. This appeal arises from Johnson’s second trial and conviction for this offense. He was first tried in Pickens County, the county in which the crime was committed and in which he was indicted. We reversed the first conviction and remanded the case for a new trial because of a juror’s failure to respond to a question during voir dire. We did not address other issues raised on appeal at that time. Johnson v. State, 536 So.2d 957 (Ala.Cr.App.1988), cert. denied, 490 U.S. 1046, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989).

. Because of our disposition of this appeal, we see no reason to address the propriety of the admission of this evidence, even though this was one of the issues raised by the appellant.

. It is arguable that even the trial court did not give such a theory any validity since no jury instruction on manslaughter was given.